

**NUMBER 13-08-00593-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**HERACLIO ERIC FLORES,** **Appellant,**

**v.**

**SHEILA REEVES FLORES,** **Appellee.**

**On appeal from the 430th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion by Justice Yañez**

This is an appeal from a protective order issued by the trial court against appellant, Heraclio Eric Flores. By four issues, appellant complains of the legal and factual sufficiency of the evidence to support the trial court's findings of past and future family

violence.[1]  We affirm.

## I. Background

Appellee, Sheila Reeves Flores, and appellant were divorced in November 2007. Sheila filed an application for a protective order on July 31, 2008.  A bench trial was held on September 24, 2008.  Sheila testified on her own behalf and called, among others, the following witnesses:  appellant, Richard Samudia, and Laura Leal.  Appellant presented the testimony of, among others, his brother, Jose Flores.

At that trial, Sheila testified that appellant's behavior after the divorce had been "in some areas" "nice and kind" but that appellant had begun "tracking" her, accusing her of being a whore, threatening to take the children away from her, and attempting to "control where [she was] at and when [she was] going to be there . . . ."  Sheila stated that she had asked appellant not to "come by" her residence; however, appellant told her that he would do whatever he wanted to do.

Sheila claimed that appellant had repeatedly "threatened that [she] will not go out with anyone else" and has stated that "he doesn't even care if he's arrested [because] [n]o matter what, he's not going to let that happen."  According to Sheila, appellant has called "each person" that she has "tried to go out with" and "talked poorly or both talked poorly about [her] and threatened them."  Sheila stated that appellant has been "telling people that [she is] using drugs" and "accusing [her] of having drug dealers out in front of her house . . . ."

Sheila testified that on one occasion when she was dropping her children off at school, appellant "blocked" her vehicle with his vehicle.  According to Sheila, appellant

---

[1] *See* TEX. FAM. CODE ANN. §§ 81.001, 85.001 (Vernon 2006).

2

"came up in a rush in his car behind" her asking her to answer her phone and to speak with her ex-boyfriend's wife, Laurie Regusa. Sheila told appellant, "Look, not at the kid's school," and then drove away. Sheila stated that, as she drove off, appellant drove around her, stopped his car in front of her car, exited his vehicle, and shouted that Sheila "better talk to" Laurie.[2] Sheila told appellant that she was going to call the police.[3] Sheila stated that appellant was "irate" and that she feared for her safety and felt threatened. Sheila explained that appellant was at her car door and the traffic was passing by her vehicle; she thought that he was "going to pull [her] out." Sheila stated that appellant "was just so, you know, angry, I did not know what to think. I just needed him to leave me alone."

Sheila testified that when she was at a friend's birthday party, appellant approached her and said, "I'm going to be watching everything you do while you're at this party. . . . You better not be talking to anybody else because I'm going to have my eye on you." Sheila stated that she purposely moved from location to location at the huge warehouse where the party was held, but she noticed that appellant "changed his positioning so that he was, like, staring at [her]." Later, Sheila and a male friend went to retrieve several items from her car, and appellant followed them outside and told Sheila's friend to go inside. According to Sheila, appellant then "blocked" her way and would not allow her to go back to the party. Sheila stated that appellant told her that they needed to

_____

[2] On cross-examination, Sheila stated:

I'd already been presented with him [appellant] zooming—oops, sorry—zooming up behind me in the gravel parking lot of my kids' school with all the other parents there, trying to blow this thing out in the middle of the parking lot. And then I was presented with him not letting me go but continuing ahead of me, blocking me off, getting out of the car in traffic and throwing a phone at my window and trying to get in my door. Yes, I felt threatened.

Sheila clarified that appellant had not "physically" thrown the phone at her.

[3] On cross-examination, Sheila stated that she had called the police regarding this incident.

3

"talk about this" and that Sheila "was not going to be seeing other people." Appellant allegedly said, "We need to get together, and we need to figure out what's going on here because I'm not going to allow you to be going out with people." Sheila told appellant that he needed to let her go, or she would call the hostess of the party to "come and help" her. After Sheila repeated this to appellant several times and fifteen minutes had passed, appellant "let" Sheila go back to the party. Sheila testified that she noticed that appellant left the party when she left.

When asked if appellant had ever called and threatened her, Sheila replied, "Well, he's done that numerous times." Sheila claimed that she recorded those threatening calls from appellant, and the trial court allowed the recordings to be played.[4] When asked, "The voice that we heard on that recording, is that the demeanor and how [appellant] approaches you?", Sheila responded, "Repeatedly, yes." The following exchange then occurred:

[Sheila's counsel]: And you felt that you had to file this protective order because he was threatening you?

[Sheila]: Correct.

[Sheila's counsel]: Did you fear for your safety? Did you feel that he could harm you?

[Sheila]: Definitely.

[Sheila's counsel]: Why do you say that?

[Sheila]: Just by how his behavior has escalated over time and because he's said statements to me that he doesn't know how he would respond if he saw me out with

---

[4] The record reveals that two recordings were played in open court. The court reporter documented that the recordings were not clear enough for transcription. The court reporter requested copies of those tape recordings. However, the court reporter noted in the record that those recordings have not been provided. Those recordings are not included in the appellate record.

4

someone, and he didn't think he would have control over himself, and from him blocking me on the two occasions that we discussed, plus one other occasion.

Sheila testified that she has asked appellant to change his behavior and leave her alone. Sheila documented that she has told appellant to leave her alone at least twice each month since December 2007. After Sheila filed her application for a protective order and appellant had agreed to mediation, she discovered a "tracking device" had been attached to her vehicle.

When asked whether she wanted appellant to be prohibited from carrying a firearm, Sheila said, "Well, I really don't feel like he would shoot me, and if he did, I guess he would go to prison for that, so I don't know. I know it means a lot to him, so I don't know what to say on that, you know."[5] However, Sheila agreed that she was fearful that appellant could harm her and was fearful for her safety and welfare.

On cross-examination, Sheila testified that appellant had been constantly calling Laurie, her ex-boyfriend's wife. Sheila stated that she had talked to Laurie, and Laurie warned her that appellant was "tracking" her phone records. According to Sheila, on another occasion, Laurie said, "I'm sorry. You know, your husband, ex-husband [appellant], keeps calling me and, you know, you need to be careful."

After the divorce, Sheila continued working for appellant's company, APEX Primary Care ("APEX") in Edinburg, Texas.[6] When asked how many times after filing the

---

[5] We note that in its order, the trial court specifically stated that appellant's license to carry a handgun was not suspended. However, in his brief, appellant states that the trial court was without authority to allow appellant to retain his license pursuant to section 411.72(a)(12) of the government code. *See* TEX. GOV'T CODE ANN. § 411.72(a)(12) (Vernon Supp. 2009). According to appellant, he was required to surrender his concealed handgun license, despite the trial court's order.

[6] We note that Sheila owns her own business, Buena Suerte Home Health Care, that is located in McAllen, Texas.

5

application for a protective order she had gone to her office, Sheila replied, "I would say not more than a total of two hours a week. . . . I would say two times a week, but I don't know how many weeks that's been. I generally try to get by there twice a week, in and out." Sheila explained that she tried to time her visits to the office when she noticed that appellant's car was not there.

When asked if appellant had ever hit her, Sheila stated that during the last year of their marriage, appellant had violently "thrown [her] out of the house." Sheila said, "He picked me up and threw me out, and I caught myself on my elbow, and it's dark. . . . And thereafter, he did not hit me again." Sheila explained that if appellant became mad at her, and she got near him, appellant would tell her, "Don't you dare come near me. Don't you dare come near me." Sheila interpreted appellant's remarks to mean that if she did go near appellant, "it could happen again."

Sheila stated that although she is not afraid when she goes to the office, she is afraid when she is out socially. She said:

> So when I walk out my door and I walk to my mailbox, I look to see if somebody is watching. And I never would have someone over at my house because I know that he would be in that door or he would get them on the way out the door. And I know all of that because he's told me that repeatedly, and he's told everyone around me that repeatedly. And he's told people who were my friends that.

Sheila acknowledged that appellant had not broken down her door, but explained that she does not have guests because she is afraid. Sheila testified that on one occasion when her ex-boyfriend came to her residence, appellant "chased [the ex-boyfriend] down when he left the house."

Sheila stated:

But I do know, on May 5th, that he [appellant] said he would always be a

6

threat if I went out with anyone. He said he would not care if he was arrested but he could be—not be trusted on how he would respond if he saw me with someone or someone saw—or saw me with someone in my house. He said that to me on the phone on May the 5th.

When asked if she was in fear for her life, Sheila said, "I believe when he says he cannot be trusted and does not know what he can do that he is genuine in that emotion. And I believe his emotions are often out of control." Sheila stated that she felt threatened because appellant told her he could not be trusted. Sheila explained that she also felt threatened because she told appellant that his brother-in-law had mowed her lawn, then appellant "went and assaulted his brother-in-law and fired his sister in front of their children . . . ." Sheila testified that appellant threatens anyone associated with her and that puts her in danger because she cannot be around anyone who is being threatened by appellant.

Samudia, a private investigator, testified that he conducted an investigation concerning a GPS device that was "strapped" to the back axle of Sheila's vehicle. According to Samudia, he went to T-Mobile, the company where the GPS device had been purchased, and discovered that the GPS device was listed on appellant's T-Mobile account. Subsequently, the device was removed from Sheila's vehicle and Samudia took the device with him. Samudia stated that when the device was turned on, he noticed that a black Jeep Cherokee, registered to Savannah Gonzalez, was following him. Samudia discovered that Gonzalez is appellant's niece. Samudia took the device with him for a day and traveled to Elsa, Texas. Samudia said:

> And the device has that on-and-off switch, so I would turn it on and off. When I wanted them to follow me, I would turn it on, and they would follow me. Then, when I would park to see who was following me, I would turn it off. And I noticed the Jeep coming around so I turned it off and I left the area.

7

I went to Monte Alto, and I turned it back on when I was on the highway and let them know that I was in Monte Alto. And when I headed back to Elsa, the Jeep was going to Monte Alto.

Samudia then went to Weslaco, Texas, and turned the device on so that the party following him would know where he was located. Once in a parking lot, Samudia turned the device off. Samudia stated that he saw appellant driving the Jeep that was following him. On re-direct examination, Samudia testified that he was certain that it was appellant who was following the GPS signal, and on cross-examination, Samudia said that there was "no doubt" that it was appellant.

Leal testified that she has worked for Sheila for about four months. According to Leal, she had never met appellant. Leal was delivering some paperwork to Sheila at her residence one morning, and she saw a Cadillac XLR parked in front of Sheila's residence. When Leal went back to her car, she noticed that the Cadillac XLR "was driving by real slow right next to her car." Leal stated that the car looked suspicious and it was driving slowly and then sped up once it passed by her car. Leal called a co-worker and asked if she knew who drove a Cadillac XLR, and the co-worker stated that appellant did. Leal identified appellant as the person she saw driving the Cadillac XLR that day.

Leal followed the car. When she lost track of where the Cadillac XLR had gone, Leal drove back to Sheila's street to make sure that there was nothing else suspicious. Leal then saw the Cadillac XLR parked on Sheila's street again.

Appellant denied knowing anything about the GPS device attached to Sheila's vehicle. Appellant stated that tracking devices are installed in all company vehicles. Appellant testified that he had no idea why the tracking device was installed on Sheila's personal vehicle and said that was a question for his maintenance department. Appellant

8

said that his maintenance department puts the tracking devices on all of his company's vehicles; however, appellant acknowledged that Sheila's vehicle did not belong to the company.

Appellant stated that on one occasion, he did park his car on Sheila's street momentarily in order to use his phone. Appellant claimed that he was passing by Sheila's residence to "see if anybody was out there" and "make sure she was okay." Appellant said that he did not recall leaving Sheila's residence and then returning. However, appellant testified that he had only passed by Sheila's residence about three or four times since the divorce. Appellant stated that he did not have a "legitimate" reason to be passing by Sheila's house.

Appellant admitted that he had contacted three men who Sheila dated after the divorce, including Michael Regusa. Appellant stated that he followed Michael and "tried to get him to pull over." Appellant claimed he wanted to talk to Michael but that he did not stop. However, appellant later stated that he knocked on Michael's window. Appellant claimed that he contacted Michael and the other men Sheila dated because he was concerned about his children.

When asked if he recalled blocking Sheila's vehicle, appellant stated that he had "never blocked" Sheila. According to appellant, he was merely trying to get Sheila to answer her phone and talk to Laurie. Appellant stated that Sheila would not pull over so he "drove past her, got in front of her and slowed down [his] car and stopped and got out of [his] car. And she was driving up, and she rolled down the window; and [she] said, 'What do you want.'" Appellant testified that Sheila was not blocked in because she could have driven around his vehicle. Appellant stated that he did not prevent Sheila from re-

9

entering the party but, instead, had noticed that she had been at her car for a long period of time and went outside and asked her to come back inside the party. Appellant denied that he was harassing or threatening Sheila.

The trial court issued a final protective order and found that appellant had committed family violence and that family violence is likely to occur in the future.[7] The protective order prohibited appellant from: (1) "committing family violence[,] ie: causing fear of bodily harm or bodily injury to [Sheila], as defined in section 71.004 of the Texas Family Code"[8]; (2) communicating directly in a threatening or harassing manner with Sheila; (3) communicating a threat through any person to Sheila; (4) "engaging in conduct directed specifically toward [Sheila] that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass [Sheila]"; (5) going to or near Sheila's residence for any other purpose than transferring the children pursuant to the parties' divorce decree or written agreement; and (6) going to or near Buena Suerte Home Health Care in McAllen, Texas.[9] The trial court also ordered appellant "[n]ot to harass, threaten or disturb the peace of [Sheila]."

## II. LEGAL AND FACTUAL SUFFICIENCY

By four issues briefed as one, appellant contends that the evidence is legally and factually insufficient to support the trial court's findings that he committed family violence

---

[7] *See* TEX. FAM. CODE ANN. §§ 81.001, 85.001.

[8] *See id.* § 71.004 (Vernon 2008).

[9] The trial court noted that appellant could communicate with Sheila at APEX pertaining to business matters, subject to the other provisions of the order. We note that pursuant to an agreement with appellant, Sheila was awarded a salary of $70,000 per year plus $17,000 to work at APEX. Sheila also agreed to continue working at APEX.

10

and that family violence would occur again in the future.[10]  Specifically, in his first and third issues, appellant argues that the evidence is factually insufficient to support the trial court's findings that family violence occurred and would likely occur in the future; by his second and fourth issues, appellant argues that the evidence is legally insufficient to support those findings.

## A.  Standard of Review

"A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact."[11]  In a legal sufficiency review, we must view the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not.[12]  The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.[13]

In a factual sufficiency review, we must consider and weigh all of the evidence in a neutral light.[14]  The evidence is factually insufficient only if we conclude "that the verdict is

---

[10] *See id.* §§ 81.001, 85.001.

[11] *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 823 (Tex. App.–Fort Worth 2007, no pet.) (citing *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362-63 (1960)).

[12] *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).

[13] *Id.* at 822.

[14] *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some evidence of probative force in support of the verdict."[15] To set aside the verdict, we must "detail the evidence relevant to the issue" and then state why the evidence is "factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias."[16]

## B.  Analysis

Appellant argues that the actions Sheila claims he committed did not "arise [sic] to the level of 'family violence' as defined by the applicable code, or as interpreted by any court in this state, and particularly by this [C]ourt."  Appellant also asserts that his alleged actions of "impeding movement on the roadway or at the party, the GPS tracking device, calling [Sheila's] lovers/boyfriends and passing by [Sheila's] home" neither resulted "in physical harm, bodily injury, assault, or sexual assault upon [Sheila]" nor placed Sheila in fear of imminent physical harm, bodily injury, assault, or sexual assault.

A trial court shall render a protective order if, after a hearing, it finds that family violence has occurred and is likely to occur in the future.[17]  Family violence includes "an act by a member of a family or household against another member of the family or household . . . that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive

---

[15] *Id.*

[16] *Id.* (internal quotations omitted).

[17] T EX. FAM. CODE ANN. §§ 81.001, 85.001.

12

measures to protect oneself."[18] Our focus, therefore, is on the evidence regarding any act by appellant that was a threat reasonably placing Sheila "in fear of imminent physical harm, bodily injury, assault" and the likelihood that such threats, if made, would reoccur in the future.[19]

In this case, Sheila stated that after the marriage ended, appellant threatened her on numerous occasions, and tape recordings of those alleged threats were played for the trial court. Sheila testified that she felt threatened and feared for her safety. According to Sheila, appellant stated that: (1) she could not go out with anyone else; (2) he was not sure how he would respond if he saw her out with someone else; (3) he did not think he could control himself if he saw her with someone else; and (4) he did not care if he was arrested. Sheila stated that appellant told her that "he would always be a threat if [she] went out with anyone" and that he could not be "trusted" if he saw her with someone or someone was at her house.

Sheila testified that she was afraid to allow guests to come to her residence because appellant "repeatedly" told her that "he would be in that door or he would get them on the way out the door." Sheila acknowledged that appellant had not broken down her door, but explained that appellant had "chased" her ex-boyfriend when he left her residence.

Sheila testified that appellant "blocked" her vehicle from leaving her children's school. Sheila described appellant as irate and stated that she feared for her safety and felt threatened. She thought that appellant was going to pull her out of the vehicle. Sheila

---

[18] *Id.* § 71.004(1).

[19] *See id.* §§ 81.001, 85.001.

called the police to report the incident. Appellant argues that Sheila's fear that he would pull her out of the vehicle was unreasonable because he had "never before laid a hand on her or harmed her in any form or fashion in the past." However, Sheila said that appellant had violently thrown her out of the house when they were still married. After that incident, Sheila interpreted appellant's request that she move away from him when he was angry to mean that he might do it again if she went near him. Appellant also prevented Sheila from re-entering a party and warned her that she better not be talking to anyone else because he was observing her activities.

There was evidence presented that appellant utilized a tracking device to monitor Sheila's vehicle. Samudia testified that when he removed the tracking device and carried it to various locations, he observed appellant driving a car registered to appellant's niece following the signal. There was also evidence presented that appellant had threatened people associated with Sheila, and Sheila testified that appellant assaulted his brother-in-law after she informed appellant that the brother-in-law had mowed her lawn. In an affidavit, admitted as petitioner's exhibit 2, Martin Pena II, Sheila's friend, stated that Jon Scepanski, appellant's friend, had contacted him and informed him that appellant had hired a private investigator to "watch" Sheila.

Sheila testified that she had asked appellant not to "come by" her residence but that appellant told her he would do what he wanted to do. Leal testified that she observed appellant parked in his vehicle on Sheila's street. Leal became so concerned about appellant's vehicle, she called another coworker and followed appellant. Appellant testified that he did not have a "legitimate" reason to pass by Sheila's residence, but admitted he had been parked on her street. On both occasions when appellant prevented Sheila from

14

leaving, Sheila asked appellant to leave her alone and appellant refused. Sheila testified that she has asked appellant to leave her alone numerous times and that after appellant agreed to a mediation, she discovered the tracking device attached to her car.

Viewing the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not, we conclude that the evidence is legally sufficient to support the trial court's findings that family violence occurred and is likely to occur in the future.[20] We overrule appellant's first and third issues. Moreover, after considering and weighing all of the evidence in a neutral light, we cannot conclude that the trial court's findings are against the great weight and preponderance of the evidence as to be manifestly unjust.[21] We overrule appellant's second and fourth issues.

## IV. CONCLUSION

We affirm the trial court's judgment.

LINDA REYNA YAÑEZ
JUSTICE

Delivered and filed the
30th day of August, 2010.

---

[20] *See City of Keller*, 168 S.W.3d at 807; *see also Clements v. Haskovec*, 251 S.W.3d 79, 84 (Tex. App.--Corpus Christi 2008, no pet.) (concluding that the appellant's behavior constituted family violence, even though he never actually struck his daughter and that appellant's threats to his wife and daughter and the fact that he raised his fist at his daughter were "sufficient to implicate his conduct as family violence"); *Siegert v. Flannery*, No. 04-03-00487-CV, 2004 Tex. App. LEXIS 6989, at **2-6 (Tex. App.–San Antonio Aug. 4, 2004, no pet.) (mem. op.) (finding that the appellant's actions of post-divorce harassing and intimidation could have been found to be threatening and to have reasonably placed the petitioner in fear of imminent physical harm, bodily injury, or assault); *Thompson v. Thompson-O'Rear*, No. 06-03-00129-CV, 2004 Tex. App. LEXIS 5033, at *4 (Tex. App.–Texarkana June 8, 2004, no pet.) (mem. op.) ("At some point, harassment may transform into an active threat.").

[21] *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

15